IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JESSICA PELZEK and RODNEY PELZEK,

                      Plaintiffs,

    v.

WISCONSIN DEPARTMENT OF CORRECTIONS,

                      Defendant.

OPINION and ORDER

18-cv-29-jdp

---

Plaintiff Jessica Pelzek and her husband, plaintiff Rodney Pelzek, worked as correctional officers at Oakhill Correctional Institution (OCI), which is operated by defendant Wisconsin Department of Corrections (DOC). The court will refer to the plaintiffs by their first names.

Jessica, an infrequent drinker, became severely intoxicated at an OCI-sponsored golf outing for employees and their guests. She alleges that a co-worker had sexual contact with her while she was so intoxicated that she was incapable of consenting, and thus the contact constitutes a sexual assault. She reported the incident to management, but the DOC failed to punish the co-worker or even investigate her allegations. She says that the DOC's inaction, and the workplace rumors and insults that she endured after the golf outing, created a hostile work environment that resulted in her constructive discharge. Rodney alleges that he faced a hostile work environment because of his association with Jessica, and that he, too, was constructively discharged. Plaintiffs have sued the DOC under Title VII of the Civil Rights Act of 1964, which prohibits workplace discrimination on the basis of sex.

The DOC moves for summary judgment. Dkt. 16. The court will grant the motion. Jessica has no memory of the events at the golf outing, and witnesses at the golf outing do not corroborate her allegation that she and her co-worker had sexual contact. She has not adduced

admissible evidence that she was sexually assaulted or that she experienced unwelcome sexual contact at the golf outing. The rumors and insults that she says she endured in the aftermath of the golf outing do not rise to the level of a hostile work environment, nor can she show that the rumors and gossip were because of her sex, rather than the result of her own conduct at the golf outing. And because Rodney's claim derives from Jessica's, his claim fails as well.

The Pelzeks move to strike portions of the DOC's reply brief for raising a new argument not made in their original brief. Dkt. 44. The DOC did not respond to the Pelzeks' motion to strike, so the court will grant it as unopposed.

UNDISPUTED FACTS

The following facts are undisputed, except where noted.

**A. May 26, 2016 golf outing**

In May 2016, Jessica Pelzek was a social worker at OCI, a prison located in Fitchburg, Wisconsin. Her husband, Rodney, also worked at OCI, as a correctional sergeant.

Every year, OCI's Employee Enhancement Committee sponsored a golf outing for DOC employees and their families and friends. Employees were not required to attend the outing, and if they were scheduled to work during the outing, they had to arrange to take time off to attend. The 2016 outing took place at Coachman's Golf Resort in Edgerton, Wisconsin.

Rodney did not attend the OCI golf outing in 2016, but Jessica did. She believed that the warden, security director, and her supervisor would be there, along with others from OCI management, and she hoped to use the outing as a networking opportunity. She arranged to take vacation leave on May 26 and 27 and arrived at Coachman's on the morning of May 26 in time for golf portion of the event, which began around 9:00 a.m.

Jessica was not a regular drinker. Jessica has no recollection of the golf event after she checked in and traded her drink tickets for two drinks. According to James Younger, a colleague who shared a golf cart with her, Jessica started with two large cans of Mike's Harder Lemonade, and she ordered more drinks from the drink cart during the round of golf. Jessica was already showing signs of intoxication by the time she finished her first drink. By midway through the round, she was too intoxicated to golf. Her colleagues told her to stay in the golf cart so that she wouldn't hurt or embarrass herself. Jessica was stumbling, falling, and slurring her words. Some colleagues testified that Jessica was being flirtatious and "touchy" with her colleagues.

After golf, the participants gathered for lunch and the presentation of awards. By that point, Jessica was so intoxicated that she had vomited. Jessica's colleagues testified that she continued being flirtatious with people at the lunch, walking up to them, trying to hug them, and even propositioning them and touching them inappropriately. Jessica continued to behave in a sexually inappropriate manner as the day wore on. Multiple colleagues testified that they tried to avoid her because of how drunk she was.

After the lunch and awards, Jessica encountered James Nyhus in the Coachman's bar. Nyhus was a correctional sergeant at OCI, but he typically worked second or third shift, whereas Jessica worked first shift, so they did not have much contact on the job. Nyhus had drunk moderately but was not intoxicated. He and Jessica played darts in the bar with a group of their colleagues. At some point, he and Jessica walked through a set of doors to an area near the bathroom, where they sat on a bench, talked, and kissed. Nyhus estimates that they spent less than five minutes kissing before they were spotted by one of their colleagues. Jessica and Nyhus then returned to the bar. Nyhus says that Jessica told him she wanted to go for a walk, so they walked outside to a fenced-in area behind the bar by some dumpsters.

The facts do not show exactly what happened between Jessica and Nyhus by the dumpsters. Nyhus testified that they were "standing there talking" and that he "do[esn't] remember" whether they kissed. Dkt. 9 (Nyhus Dep. 64:13–14, 21). Although Jessica came to believe that she and Nyhus had sexual contact, she has no memory of any of it. Michael Rear, an OCI correctional officer, testified that around 4:00 p.m., he saw Jessica and Nyhus walk behind the fence to the dumpster area. Rear walked nearer to the fence; he could see through the gap between the fence and the ground that Nyhus's and Jessica's feet were close together.

Rear couldn't see what Nyhus and Jessica were doing, but he "thought it was something that shouldn't have been happening," Dkt. 11 (Rear Dep. 36:18–19), so he tossed a cup of ice water over the top of the fence to get their attention and said "Nyhus, I'm friends with [Rodney] Pelzek, and I'm going to tell him." *Id.* at 48:24–25. Nyhus testified that he came out from behind the fence to talk to Rear, but that Rear would not talk to him. Dkt. 9 (Nyhus Dep. 70:6–71:1). Rear testified that Nyhus did not attempt to speak with him and that he did not see him emerge from the dumpster area. Dkt. 11 (Rear Dep. 38:12–14). Nyhus went back to the dumpsters where Jessica was, and Rear left Coachman's shortly thereafter without attempting to intervene further. Eventually, Nyhus and Jessica ended up going back into the bar.

Nyhus testified that he offered to drive Jessica home, but she refused, so he left her at Coachman's. Jessica called Younger to ask him to take her home, but he declined. Jessica called Rodney three times around 7:45 p.m.; he called back at 8:19 p.m. At 8:30, Rodney arrived at Coachman's and pulled up next to Jessica's vehicle in the parking lot. Jessica was sitting in the driver's seat of her car. It took her almost a minute to notice Rodney's arrival, and when she did she got out of her car and stumbled to Rodney's, forgetting her purse and keys in the

4

process. She smelled of alcohol and had slurred speech. Rodney took Jessica home and put her to bed.

**B. Aftermath of the golf outing at OCI**

On May 31, 2016, five days after the golf outing, Rodney received a series of text messages from Jim Logan, a correctional sergeant at OCI who had been at the golf outing. Logan told Rodney that he had "heard about something that was concerning" related to the OCI golf event, and advised him to speak with Wade Chapman, an OCI correctional officer and Nyhus's roommate. Dkt. 38-3. Logan then called Rodney and they spoke for ten minutes. Based on this phone call, Rodney came to believe that Chapman was saying that "people were bragging about taking sexual advantage of [his] intoxicated wife at the OCI golf event." Dkt. 38, ¶ 5. Rodney began calling around to other OCI employees that he thought might have more information, but he wasn't able to learn anything new before his work shift started at 3:00 p.m. Before he left for work, he talked to Jessica about what he had heard from Logan.

During Rodney's shift on May 31, he learned that Rear had information about what had happened at the golf event. Rear and Rodney spoke on the phone, and Rear told Rodney that Jessica had been severely intoxicated and falling over, that everybody was laughing at her, and that he had seen Jessica and Nyhus behind the dumpsters and thought they were doing "something sexual." Dkt. 42, ¶ 76. When he got off the phone with Rear, Rodney spoke with a handful of other OCI employees, who told him similar rumors about Jessica's behavior during the golf outing. Rodney was so distressed by the stories that he felt ill and ultimately went home sick around 7:00 p.m.

That night, Rodney and Jessica went to the Emergency Department at the VA Hospital to have Jessica tested for "date rape drugs." They were told that such a drug administered on

5

May 26 would no longer be detectable in her system. (Jessica does not allege in this case that she was actually drugged.)

When Jessica returned to work following the golf outing (the exact date is not clear), she sensed that her colleagues were avoiding her. Correctional officers refused to look her in the eye when she went into their units to meet with inmates. At one point, Stacey Bitter, a roving sergeant who travels between each of OCI's 11 units, came to Jessica's office and told her that staff in various units were laughing, joking, and saying "really bad things" about what happened at the golf outing, and that the rumor was that "she and Nyhus had made out and something sexual happened." Dkt. 10 (J. Pelzek Dep. 16:22–24). Another sergeant, Sergeant Radtke, told her that thanks to her he wasn't "the drunk of the institution anymore." *Id.* 62:24–25.

On June 1, Jessica emailed Nyhus using her work email. She wrote:

> I don't remember half the day. I think I was roofied or something. I ended up going to the Dr. and was diagnosed with Transient Global Amnesia. I was completely out of character and in any state of mind; would not have been the way I was as I have been told. I do remember talking with you vaguely, but that's all. I apologize if I said or did something. I legitimately do not remember. Lots of rumors, and [Rodney] Pelzek has been getting text messages and calls from a lot of people. https://en.wikipedia.org/wiki/Transient_global_amnesia. If you want to call me, I'm in my office. X2883.

Dkt. 36-2, at 1. Nyhus responded a short time later with the following:

> You said u had taken meds earlier in the day, they probably just didn't mix well with the alcohol. People can talk or start stupid rumors but nothing happened. I don't [*sic*] how all this crap seemed to blow up or get so out of hand. Its really ridiculous. This place is like fricking high school, but probably actually worse. Its annoying and actually makes me mad that people are running their mouth saying this crap. Soon enough someone will do something stupid and everyone will talk about that, this place has

6

> a never ending cycle of stupid drama. But u didn't do anything wrong so don't worry. This non-sense will blow over soon enough.

*Id.* The next day, Jessica wrote back a second time:

> There are eye witnesses that seen us behind the building by the dumpsters and we were back there for a while. What specifically were we doing if "nothing happened?" What meds did I tell you I took? So why is your roommate telling people that you were bragging about what we did?

*Id.* at 3. Nyhus responded the following morning, saying "I'll give you a call later here at work instead of emailing back and forth." *Id.* at 5. Jessica responded later that same day: "Don't bother contacting me. I've already heard what happened from everyone else." *Id.* at 6.

The week following the assault, Jessica confided in some of her colleagues about the incident. Specifically, she spoke with an OCI records supervisor and an OCI payroll and benefits specialist, expressing her concerns that Nyhus had taken advantage of her and her distress about the rumors circulating among OCI staff.

Rodney took FMLA leave starting June 1 or 2 to take care of his stepfather, who had been in a motorcycle accident. Rodney stayed with his stepfather in the hospital for approximately two months.

## C. Jessica files a harassment complaint

On July 19, Jessica filed a harassment complaint at OCI. The same day Marty Winchell, an OCI lieutenant, conducted an intake interview with Jessica about her allegations. *See* Dkt. 26-6 (intake interview write-up). Rodney was also present for the interview.

Jessica told Winchell about the rumors that she and Rodney had heard. She said that she believed she may have been "roofied" and sexually assaulted, and provided Winchell with a copy of her email exchange with Nyhus. She also volunteered that Rodney had text messages showing that staff members were contacting him about the golf outing, but Winchell did not

ask Rodney to provide them. Jessica told Winchell that she had the impression that her colleagues and supervisors were treating her differently following the golf outing. She noted that her supervisors had delegated her conduct report work to a different social worker, and spoke at length about an incident in which two supervisors had interrogated her for two hours about her paperwork practices.

Jessica concluded her interview with Winchell by stating that she had "reason to believe that . . . [she] was sexually assaulted" and that it was "hard to work in this type of environment." Dkt. 26-6, at 6. Winchell urged the Pelzeks to report the assault to law enforcement, but the Pelzeks indicated that they would prefer that it be handled "in house." *Id.*

The day after her interview with Winchell, Jessica went on a previously scheduled month-long medical leave for a surgical procedure. OCI did not investigate Jessica's allegations or take any other action in response to her complaint. As time passed with no updates from OCI about an investigation, Jessica became increasingly distraught. She was supposed to return from her medical leave on August 22, but her psychiatrist certified her for FMLA leave on August 18 because she was "severely depressed with extreme anxiety and emotional shutdown." Dkt. 37-2, at 4.

**D. Rodney and Jessica end employment at OCI**

On August 19, Rodney sent a letter of resignation to several OCI officials, including OCI Warden Douglas Percy. Rodney explained:

> Due to recent disheartening work related events, it saddens me to inform you that I will be resigning from my position as Correctional Sergeant at Oakhill Correctional Institution.
>
> On 5/26/16, my wife was victimized at the Oakhill Golf Event, sexually by Sergeant James Nhyus [*sic*], and morally by the rest of

8

> the DOC staff who witnessed her severe intoxication and did nothing to help her. This event has completely exhausted my trust in the attending coworkers and Supervisors at Oakhill Correctional Institution. I have attached a word document that I have typed out with the facts I have gathered regarding this incident. . . .
>
> On 7/19/16, my wife reported some of what we had learned about the OCI Golf Event to Lieutenant Winchell during her Harassment Intake. . . . It has been a month since and we have not heard anything about action being taken. The document I have attached will help when questions do finally start being asked.

Dkt. 26-1, at 2. The four-page statement Rodney included with his resignation letter chronicled the Pelzeks' understanding of the events leading up to and following the golf outing and the evidence suggesting that Nyhus had sexually assaulted Jessica while she was incapacitated.

On August 26, Rodney received a letter in response from Warden Percy. It stated:

> In your resignation letter and an associated document that you sent, you raised some serious allegations regarding an incident involving your wife. Because the alleged incident did not occur on state property and any alleged involved employees were not in pay status, I would strongly encourage you to contact local law enforcement regarding this matter. My understanding is that Lt. Winchell also suggested that you contact local law enforcement during your wife's intake interview. We did attempt to contact you by phone on August 23 and August 26 to discuss this issue, but you were not available.

Dkt. 26-2, at 1.

That same day, Percy sent a letter to Jessica with an update about OCI's handling of her complaint. Percy stated that he had reviewed the information Jessica had provided to Winchell and determined that her concerns did not "rise to the level of harassment or discrimination as defined in Executive Directive 5." *Id.* at 2. Executive Directive 5 is the DOC policy prohibiting sexual harassment. Percy noted that Jessica had "raise[d] another serious allegation," but that "[b]ecause this alleged incident did not occur on state property and any

9

alleged involved employees were not in pay status, [he] would strongly recommend [that she] contact local law enforcement regarding this matter." *Id.* The letter made clear that no further action would be taken. Jessica never returned to OCI.

The court will discuss additional facts where relevant to the analysis.

ANALYSIS

**A. Summary judgment standard**

Jessica and Rodney assert claims under Title VII of the Civil Rights Act of 1964. Title VII prohibits workplace discrimination on the basis of sex, among other things. 42 U.S.C. § 2000e-2(a)(1). Discrimination includes "requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). Jessica and Rodney contend that they were subjected to a hostile work environment based on the alleged assault at the OCI-sponsored outing and the demeaning rumors and comments that circulated in its aftermath. Both plaintiffs contend that their working environments was so unbearable that they were left with no choice but to resign.

To succeed on their hostile work environment claims, plaintiffs must prove: (1) they were subjected to unwelcome harassment; (2) the harassment was based on sex (or membership in some other protected class); (3) the harassment was sufficiently severe or pervasive so as to alter the condition of their employment and create a hostile or abusive atmosphere; and (4) there is a basis for employer liability. *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 940 (7th Cir. 2007). Their claims for constructive discharge "require proof that the employer's discriminatory conduct forced the plaintiff[s] to resign because [their] working conditions,

from the standpoint of a reasonable employee, had become unbearable." *Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 366 (7th Cir. 2009) (citations and quotation marks omitted).

Summary judgment is appropriate if a moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A party may not simply rely on the allegations in its pleadings to create such a dispute, but must "demonstrate that the record, taken as a whole, could permit a rational finder of fact to rule in [its] favor." *Johnson v. City of Fort Wayne, Ind.*, 91 F.3d 922, 931(7th Cir. 1996).

## B. Jessica's hostile-work-environment claim

Jessica's hostile-work-environment claim has two components—the encounter with Nyhus at the golf outing, and the various rumors, comments, and changes in treatment that followed. The court will assume, without deciding, that the OCI-sponsored golf outing was part of the OCI work environment.

### 1. Hostile work environment at the golf outing

Jessica contends that at the golf outing she suffered a single incident of sexual harassment that was so serious that it constituted a hostile workplace actionable under Title VII. The court will accept the basic principle that a single incident of severe sexual harassment can create a hostile work environment if there is a basis for employer liability for the incident.

Jessica does not contend that Nyhus's attention was unwelcome. The sole theory that Jessica advances in opposition to the DOC's motion for summary judgment is that Nyhus

sexually assaulted her, under the definition of sexual assault in Wis. Stat. § 940.225(2)(cm). Section 940.225(2)(cm) makes it a Class C felony to:

> Ha[ve] sexual contact or sexual intercourse with a person who is under the influence of an intoxicant to a degree which renders that person incapable of giving consent if the defendant has actual knowledge that the person is incapable of giving consent and the defendant has the purpose to have sexual contact or sexual intercourse with the person while the person is incapable of giving consent.

Jessica contends that she was so drunk that she was incapable of giving consent, so that any sexual contact between her and Nyhus would constitute sexual assault. Jessica doesn't explain why the standard for a state criminal law should be read into a federal civil rights statute. But even if the court assumes for the purpose of summary judgment that conduct that violates § 940.225(2)(cm) can qualify as sexual harassment under Title VII, Jessica's claim fails because she does not adduce admissible evidence to support her claim of sexual assault.

It is undisputed that Jessica was very intoxicated and impaired. But that alone is not enough: the question is whether she was so intoxicated that she was *incapable* of giving consent. Jessica has no memory of the events at the golf outing. But the testimony of the many witnesses shows that Jessica engaged in a great deal of volitional behavior despite her intoxication. After lunch, she was able to walk, talk, play darts, and even propose sexual encounters. She voluntarily went for the walk with Nyhus; they might have been holding hands, but there is no evidence that he forced her to go anywhere. Jessica was very intoxicated, but in response to the defendant's motion for summary judgment, she does not explain how she would show that she was incapable of consent. And Jessica would also have to show that Nyhus *knew* that she was incapable of consent, to show that he had the purpose to have sexual contact with her while

she was unable to consent. Jessica does not address what proof she has that Nyhus knew that she was incapable of consent.

A more fundamental problem with Jessica's theory is that she has no admissible evidence that any sexual contact occurred with Nyhus. Kissing is not sexual contact; sexual contact requires the touching of an intimate body part, § 940.225(5), which means "the breast, buttock, anus, groin, scrotum, penis, vagina or pubic mound of a human being," § 939.22(19). Jessica came to believe that she had been sexually assaulted because she heard rumors that Nyhus was bragging about having taken advantage of her. But the comments Jessica heard are extremely vague and don't specify what happened with Nyhus. The Pelzeks heard that Jessica and Nyhus had done "something sexual"; that it was "really bad"; and that they had been "making out" and "[p]ossibly more." Dkt. 42, ¶¶ 76, 79, 81, 108. (Jessica says that the term "making out" is commonly understood to entail more than just kissing, Dkt. 35, at 17–18, but she adduces no evidence that this was the implication here.) And of course those rumors are hearsay upon hearsay and thus inadmissible to prove Jessica's claim.

Jessica cites Rear's deposition testimony, but his testimony confirms that he didn't see what happened near the dumpsters. He thought something inappropriate was going on, but that is not evidence that Nyhus had sexual contact with Jessica. Jessica also cites statements made by Nyhus in 2015 that he thought Rodney was a "pussy" and that he wanted to "fuck" Jessica. Nyhus says these statements were made in jest, testimony that Jessica has not rebutted. More important, Nyhus's much earlier crude statements are not evidence that Nyhus actually had sexual contact with Jessica at the golf outing.

The only admissible evidence of what happened between Nyhus and Jessica is Nyhus's own testimony. Jessica contends that his testimony is self-serving, but that gives the court no

13

basis to reject it. *Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013) ("As we have repeatedly emphasized over the past decade, the term 'self-serving' must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment.") Nyhus concedes that he and Jessica kissed. But he says he does not recall whether they kissed near the dumpsters and he disavows any other sexual activity with Jessica. Jessica has no admissible evidence to rebut Nyhus's testimony, and even the hearsay rumors she cites do not directly contradict Nyhus's testimony.

"[S]ummary judgment is the 'put up or shut up' moment in a lawsuit." *Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068, 1077 (7th Cir. 2016). Jessica has adduced no admissible evidence that she was sexually assaulted at the golf outing. A jury tasked with deciding whether the May 26 encounter constituted unwelcome harassment could do no more than speculate whether Nyhus and Jessica had any sexual contact. The court will grant summary judgment on the portion of Jessica's hostile-work-environment claim arising out of the alleged assault.

2. **The aftermath of the golf outing**

Jessica also makes a hostile-work-environment claim based on the rumors, comments, and changes in treatment she experienced following the golf outing. Jessica says that when she returned to work after the golf outing, her colleagues "avoided her like the plague" and wouldn't make eye contact with her. Dkt. 42, ¶ 105. She was informed by a colleague that people were gossiping about her, and one of her colleagues referred to her as "the drunk of the institution." Dkt. 10 (J. Pelzek Dep. 62:24–25). In her interview with Winchell, Jessica also identified two instances in which she believed that her supervisors treated her differently because of the golf outing. First, she complained that her supervisors had delegated her conduct report work to

14

another social worker. Dkt. 42, ¶ 131. She does not explain who made this decision or when, or why she believed the decision was related to the golf outing. Second, Jessica complained that two of her supervisors had interviewed her for two hours about her paperwork practices, and that at the end of the meeting, one of the supervisors asked about Rodney in a way that Jessica found condescending. *Id.* ¶¶ 132–35. Jessica doesn't explain how this two-hour interview was related to the golf outing.

The DOC contends that none of these occurrences were so severe or pervasive as to render her work conditions objectively hostile as required under the third element. As a rule, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Neither will assertions that a supervisor or colleague has acted in a standoffish or unfriendly way. *McKenzie v. Milwaukee Cty.*, 381 F.3d 619, 625 (7th Cir. 2004). Jessica no doubt found the prospect that others were gossiping about her subjectively offensive and distressing, but "[a]n objectively hostile work environment will not be found where most of the conduct that forms the basis of a plaintiff's claim consists of derogatory statements made . . . out of her hearing, and the rest is isolated and not particularly severe." *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 645 (7th Cir. 2005).

Jessica has not established that any of the rumors she heard or any treatment she received was as a result of her sex, and not simply the consequence of her conduct at the golf outing. Nor has Jessica adduced evidence of conditions so severe as to constitute a hostile work environment. The court will grant the DOC's motion for summary judgment on the remaining portion of Jessica's hostile-work-environment claim.

## C. Jessica's constructive-discharge claim

Jessica contends that she was constructively discharged when the DOC failed to investigate or otherwise respond to her complaint. The standard for a constructive discharge is demanding. The plaintiff must show that her working conditions were "even more egregious than the high standard for hostile work environment because in the ordinary case, an employee is expected to remain employed while seeking redress." *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 2000) (citations and internal quotation marks omitted). To survive summary judgment, Jessica "must show that her working conditions were 'so intolerable that a reasonable person would have felt compelled to resign.'" *Patton v. Keystone RV Co.*, 455 F.3d 812, 818 (7th Cir. 2006) (quoting *Pa. State Police v. Suders*, 542 U.S. 129 (2004)). The Seventh Circuit hasn't articulated a specific benchmark for determining what is intolerable. But it has recognized working conditions where a plaintiff reasonably fears "serious physical harm" as "illustrative of one general circumstance meeting this higher standard for harassment." *Id.* Jessica has not met this demanding standard here.

A constructive discharge claim rests on an underlying hostile work environment claim, so Jessica's failure to adduce evidence in support of her hostile work environment claim dooms her constructive discharge claim as well. *See Bannon v. Univ. of Chi.*, 503 F.3d 623, 630 (7th Cir. 2007). But even if the court were to assume that Jessica could show a constructive discharge without first proving sex discrimination, this claim would still fail. Jessica does not contend that she felt physically unsafe at work because of the alleged harassment, nor is there evidence that Jessica would have encountered Nyhus on the job because they worked different shifts. Jessica took a previously scheduled medical leave of absence on July 20, 2016, and she decided to resign from the DOC approximately one month later. She was not present in the

16

workplace in the intervening weeks, and she testified that her resignation was prompted by the DOC's decision not to investigate her complaint. This undermines any inference that she was driven to resign because she could no longer tolerate the working conditions. If Jessica had evidence that Nyhus had sexually assaulted her, and OCI had simply ignored that evidence, Jessica might have a colorable claim that OCI had left her to fend for herself in a dangerous workplace. But OCI officials encouraged Jessica to report her allegations to law enforcement, so it would not be fair to characterize OCI as attempting to cover up the incident. Jessica's failure to adduce evidence of a sexual assault in this case, and her decision not to report her allegations to law enforcement, undermines any claim that OCI handled her complaint unreasonably.

Based on the evidence adduced here, Jessica's decision not to return to work after her medical leave was voluntary, and not the result of egregious working conditions. The court grants the DOC's motion for summary judgment on Jessica's constructive discharge claim.

### D. Rodney's claims

That leaves Rodney's claims. In the complaint, the Pelzeks alleged that Rodney was subjected to a hostile work environment by virtue of being forced to endure "the continued presence of the individual who sexually assaulted his wife." Dkt. 1, ¶ 33. They further alleged that Rodney was constructively discharged due to the DOC's failure to take appropriate corrective action. *Id.* ¶ 34. But in their opposition to the DOC's summary judgment motion, the Pelzeks do not explain how Rodney's claim meets any of the four elements of a hostile-work-environment claim. Instead, they focus exclusively on his alleged constructive discharge, asserting that although Rodney "was not personally harassed . . . by management or co-

workers," he was nonetheless forced to resign because he was "tormented by management's failure to even investigate his wife's complaint." Dkt. 35, at 27.

The Pelzeks have not clearly explained the legal basis for this theory of liability. Apparently, Rodney seeks to assert a derivative claim that he was constructively discharged because of the discrimination that Jessica experienced on the basis of sex. Courts have interpreted Title VII to allow claims of discrimination based on a plaintiff's association with a third party in certain instances. *See, e.g.*, *Hively v. Ivy Tech Cmty. Coll. of Ind.*, 853 F.3d 339, 348–49 (7th Cir. 2017) (discrimination based on a plaintiff's involvement in a same-sex relationship violates Title VII); *Ineichen v. Ameritech*, 410 F.3d 956, 961–62 (7th Cir. 2005) (collecting cases holding that discrimination against plaintiffs because they are involved in interracial relationships violates Title VII). But the essence of these associational claims "is that the *plaintiff* would not be suffering the adverse action had his or her sex, race, color, national origin, or religion been different." *Hively*, 853 F.3d at 349 (emphasis in original). That is not the case for Rodney; he simply contends that he suffered because his wife was facing discrimination.

Rodney was distraught when he heard about Jessica and Nyhus, but Rodney concedes that he did not face any workplace discrimination or hostility at OCI. Dkt. 41, ¶ 108. Within a day or two of hearing the rumors about the golf outing, he went on a two-month FMLA leave to care for his injured stepfather. The lack any evidence of actual harassment is fatal to Rodney's claims. The court will grant the DOC's motion for summary judgment on Rodney's claims.

CONCLUSION

Nyhus conducted himself poorly at the May 26 golf outing, as did Jessica. The workplace gossip that followed the golf outing was undoubtedly embarrassing and anxiety provoking for both Jessica and Rodney. But "Title VII is not a general code of workplace civility, nor does it mandate 'admirable behavior' from employers." *McKenzie*, 381 F.3d at 624. The Pelzeks have failed to adduce admissible evidence in support of their claims of workplace discrimination, and the DOC is entitled to summary judgment.

ORDER

IT IS ORDERED that:

1. Plaintiffs Jessica and Rodney Pelzek's motion to strike the DOC's reply brief, Dkt. 44, is GRANTED.

2. Defendant Wisconsin Department of Corrections' motion for summary judgment, Dkt. 16, is GRANTED.

3. The clerk of court is directed to enter judgment in favor of defendant and close the case.

Entered June 28, 2019.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge